# United States Court of Appeals for the Fifth Circuit

No. 25-20590

United States Court of Appeals
Fifth Circuit

**FILED**

September 2, 2026

Lyle W. Cayce
Clerk

Kerry Lee Thomas,

*Plaintiff—Appellee*,

*versus*

Eric M. Bruss; Wayne Schultz,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-662

Before King, Smith, and Ramirez, *Circuit Judges*.

Per Curiam:

This concerns qualified immunity ("QI") for bystander government officers. Two police officers arrived to the scene of an active arrest with an unknown number of suspects, one claiming he "was ready to die" and challenging the officers to "kill me!" Soon after those officers arrived, another officer already on the scene released his police dog to control the suspect while that same officer handcuffed the suspect.

The two late-arriving officers did not intervene. The district court denied QI for all three, concluding that there were genuine disputes of mate-

rial fact as to the bystander officers' participation and that the law was clearly established as to bystander officer liability under § 1983. We reverse because the law was not clearly established for bystander officer liability under these facts.

I.

A.

At 7:15 one evening in February 2021, the Harris County Constable's dispatch received a 911 call saying that two men were "screaming and yelling" outside the caller's house for the second time that night. The caller advised dispatch that he (the caller) had a weapon. Dispatch relayed that information to officers responding to the scene, including Robert Johnson,[1] the canine handling officer, and defendants Eric Bruss and Wayne Schultz. As with many QI cases, it is necessary to explain the sequence of events in precise detail.

1.

Johnson was a trained handler and had his canine partner with him. While Johnson was en route, dispatch again relayed that the caller had a weapon out, to which Johnson asked dispatch to tell the caller to put his gun away if the suspects were no longer there.

Johnson arrived first, at 7:21, opened the door of his patrol car, and commanded the two suspects to put their hands up while he drew his sidearm. He soon retrieved his canine and commanded the suspects to get back into their car and wait.

The driver, Raphael Gray, got back into the car, while Kerry Thomas,

[1] Johnson since died, and his estate remains as a defendant but does not participate in this appeal.

the plaintiff, remained standing outside the car with his hands in the air. Thomas yelled, "kill me!" and "all lives matter!" among several other phrases that are indistinct in the body camera video. Gray soon moved to get out of the car but retreated when Johnson yelled at him.

When Bruss arrived two minutes into this exchange, Johnson informed him that the driver (Gray) was not complying and warned both to "Stop f—g reaching!" Thomas responded that he was "reaching to God." At 7:23:45, Johnson told Bruss that they should subdue the passenger first. He then told Thomas to "stay in the f—g car now!" while Bruss engaged with Gray, *infra*.

Thomas started advancing around the passenger door toward the officers. Johnson warned him, "passenger stop!" several times, 7:24:00–11. Thomas, with his hands in the air, responded, "Jesus, man, kill me!" Bruss then informed Johnson he had the driver at gunpoint, and Johnson commanded Thomas, "passenger, go to the ground." After repeated commands, Thomas started going to the ground, eventually lying down prone at 7:24:40, where he remained while looking up periodically.

Johnson then told Bruss to take the driver into custody. At 7:26, Bruss directed Gray to stand up, turn around, and walk backwards toward him to get handcuffed, *infra*. Once Gray was in custody, the officers pivoted to Thomas. Schultz, who arrived at 7:25:30, positioned himself behind Johnson and commanded Thomas, "you in the grey, step up, do it now!" Schultz repeated the command several times. At 7:27:10, Johnson added, "this is your last chance or I'm gonna send the dog after you." Thomas looked up but did not get up. At 7:27:18, Johnson repeated, "Last warning or I'm gonna send the dog." A few seconds later, Johnson released the dog, which raced over and bit Thomas on his right upper arm.

Johnson immediately advanced on Thomas, commenting, "Think

you're f—g around, don't you?" and commanding Thomas to put his hands behind his back. Johnson proceeded to handcuff Thomas on the ground while the dog maintained the bite, taking approximately 30 seconds from 7:27:30–28:02 as Thomas thrashed in pain. Johnson finished applying the handcuffs, stood up, told the dog, "good boy," and pulled back on the dog's hind legs to get it to release its bite. Johnson complimented the dog again and returned it to the police car at 7:28:17.

The total duration of the dog bite was 43 seconds.

2.

Bruss arrived to the scene at 7:23:26, when Thomas can be heard yelling "all lives matter!" When Johnson told Bruss that the driver was not complying with orders, 7:23:37, Bruss yelled "stop reaching!" at 7:23:40. After a pause, Bruss said, "hey passenger, passenger with the head, show me your hands, show me your hands or you're getting shot!" Gray slowly showed his hands at 7:23:58.

Bruss commanded Gray to walk toward him; Gray exited the vehicle into the street with his hands in the air.[2] Bruss warned Gray, "if you try to run, you're getting dog bit," and after Gray got down to the ground, warned him, "Keep your head down, keep your hands out, stop moving around. This isn't a game, my man. This is how bad things happen. You need to comply with what I'm telling you to do. We've been told you've got a gun. Until we determine that you don't, this is what's going to happen. You're going to follow the directions." 7:24:50. Bruss continued, "Get your hands out to your sides, you're gonna get dog bit if you don't comply with what I'm telling you to do. And that's gonna hurt," at 7:25:25. And then Bruss added, "You

---

[2] At this point, Thomas came around the vehicle and was ordered back by Johnson, *supra*.

are an unsearched suspect. Until I know that you don't have a gun, you better comply" at 7:25:40. Bruss directed Gray to get up slowly, turn around, walk backwards, and kneel so that another deputy could handcuff and take him away, 7:26:00–40.

Bruss then remained on the scene as Johnson issued the "step up" commands as many as eight times and then released the canine, 7:27:00–25. Once the dog was on Thomas, Bruss quickly walked to the opposite side of the vehicle to inspect it for other persons, weapons, or threats, and declared it cleared, 7:27:25–40. He then came back to the front of the car, seeing Johnson placing Thomas in handcuffs while the canine maintained its bite, 7:27:43.

As Thomas writhed, Bruss commented, "Soon as he gets you handcuffed, he'll get the dog off you," "stop moving around," and "he still hasn't been searched." 7:27:58–28:07. He then told Johnson to "take him [the dog] off the bite," 7:28:10. Once Johnson had pulled back the dog, Bruss commanded Thomas to "roll over on your stomach now, roll over on your stomach you ain't seen nothing yet if you don't comply." 7:28:13. A few moments later, Bruss commented, "should've complied, my man." 7:28:34.

Bruss was on the scene for a total of four minutes before the dog bite, during which he arrested the other suspect, Gray, and searched the vehicle. He soon administered Narcan to Thomas, who later tested positive for certain unlawful substances.

3.

Schultz arrived at 7:25:30; before arriving, he heard on the radio Johnson stating that the suspect was not complying and was asking to be shot. When he arrived, he took position behind Johnson with his taser drawn. 7:25:48. Schultz told Johnson, "I'll get him," and commanded Thomas to "step up," "stand up," and "do it now," several times. 7:26:50–27:20.

Schultz watched as Johnson released the dog, the dog bit Thomas on the right arm, and Johnson handcuffed Thomas. After Bruss declared the vehicle safe, Schultz holstered his taser. 7:27:37. He then silently watched the remainder of Johnson's arrest and watched Johnson remove the canine. 7:27:37–28:15. After Johnson had removed the dog, he joined Bruss in telling Thomas to "roll over," then immediately called EMS for the dog bites. 7:28:17.

Schultz was on the scene for two minutes before the dog bite.

B.

Thomas sued the Estate of Johnson and Bruss and Schultz. Bruss and Schultz filed a motion to dismiss, arguing Thomas had failed to state a claim and they were entitled to QI.

The district court denied the motion, first determining that "Johnson [plausibly] used excessive force" and then that "[t]he inferences arising from the complaint allegations and video plausibly state a claim for bystander liability against Bruss and Schultz." On QI, the court stated, "the many decisions from the Fifth Circuit [that it] cited above[] offered ample notice to the officers that it [was] unconstitutional to use physical force sufficient to severely injure a suspect when that suspect [was] compliant or ha[d] been at most passively resisting." With no citation, the court continued, "[t]he circuit has also been clear that the exact means of inflicting the force need not be identical for officers to be on notice that their actions violate clearly established law." It then distinguished the cases proffered by Bruss and Schultz and denied QI.

Thomas next moved for partial summary judgment and for default judgment against the Estate of Johnson. Bruss and Schultz cross-moved for summary judgment, reasserting QI. The district court denied the cross-motions for summary judgment, finding that there were "genuine factual disputes material to determining whether, *under clearly established law*, Bruss

and Schultz had a reasonable opportunity to intervene to stop the dog bite after Thomas was subdued" (emphasis added). Bruss and Schultz appeal.

II.

## A. Standards of Review

1.

This court reviews the grant or denial of summary judgment *de novo*, applying the same standards as the district court. *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007). A party can immediately appeal the denial of summary judgment based on QI.[3]

2.

"The doctrine of [QI] protects public officials from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[4] QI protects "all but the plainly incompetent or those who knowingly violate the law,"[5] so courts will not deny its protection unless existing precedent renders the question "*beyond debate*."[6] The QI standard "gives ample room for mistaken judgments." *Malley*, 475 U.S. at 343. "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*,

---

[3] *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012); *accord Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of [QI], to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.").

[4] *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

[5] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[6] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

502 U.S. 224, 229 (1991) (citation modified).

"[A] plaintiff seeking to overcome QI must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Carmona v. City of Brownsville*, 126 F.4th 1091, 1096 (5th Cir. 2025); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

A government official "violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (citation modified). In analyzing the right at issue, we may not "define clearly established law at a high level of generality." *Id.* at 742. Rather, we must consider "in light of the specific context of the case" whether the particular conduct at issue violates a clearly established right. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (citation modified). A right is clearly established only if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (cleaned up) (citation omitted).

Once a defendant has asserted QI, "the burden shifts to the plaintiff to show that the defense is not available." *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the [c]ourt, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Newman*, 703 F.3d at 763 (citation modified). Equivalently, once a defendant raises a QI defense, the burden rests with the plaintiff to show a specific constitutional violation by identifying genuine disputes of material fact with respect to the elements of the claim and a controlling body of law governing such a claim. The burden

therefore is not with the defendant affirmatively to disprove every element of the claim. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

Plaintiffs must point to controlling authority or "a robust consensus of cases of persuasive authority" that clearly establishes the right in question. *al-Kidd*, 563 U.S. at 742 (cleaned up). Although a case does not have to be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). Equivalently, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (citation modified).

The plaintiff must further "show that the violated right was 'clearly established' *at the time of the alleged violation*." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020) (emphasis added). Where multiple defendants are involved, the plaintiff must allege with specificity what each defendant did to invade a constitutionally protected right, and the court must analyze each invocation of QI separately.[7]

Finally, the movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," which summary judgment standard applies to QI. *Celotex Corp. v. Catrett*,

[7] *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994); *see also Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) ("In cases where the defendants have not acted in unison, [QI] claims should be addressed separately for each individual defendant." (citation modified)).

477 U.S. 317, 323 (1986).

### B. Forfeiture

As a preliminary matter, we acknowledge Bruss and Schultz's contention that Thomas forfeited his arguments on "clearly established law." We pretermit a response to that assertion, however, and instead show that, assuming there was no forfeiture, Thomas fails to satisfy his burden on the clearly-established-law prong of QI.

### C. Bystander Liability

#### 1.

Turning to the merits: Bruss and Schultz centrally contend that "the district court failed to hold Thomas to his well-established burden of identifying an analogous case in which officers were found to have violated the Fourth Amendment by failing to intervene in a similar situation." By similar situation, they mean "an active canine-assisted apprehension."

Bruss and Schultz point to *Sligh v. City of Conroe*, 87 F.4th 290 (5th Cir. 2023) (per curiam) and assert that "this court held that a canine officer's decision to deploy his canine constituted an excessive use of force, but also held that a bystander officer was nevertheless entitled to [QI] because the plaintiff failed to identify law clearly establishing that the bystander officer violated the Constitution by failing to intervene." Bruss and Schultz assert that, similarly to the plaintiff in *Sligh*, "Thomas failed to identify a single case holding that officers acting under similar circumstances had a constitutional duty to intervene."

Bruss and Schultz add, "[t]he district court generously interpreted Thomas's briefing as identifying clearly established law, but the cases that Thomas (and the court) relied on do not remotely establish a duty to intervene during an active canine-assisted apprehension. Indeed, most of the

cases do not involve canine-deployments—and several do not involve bystander liability at all." Because those authorities "involve materially different uses of force and fundamentally different circumstances," Bruss and Schultz assert that those authorities "cannot clearly establish that [these bystander officers] had a constitutional duty to intervene during the forty-three-second canine-assisted apprehension at issue in this case." Bruss and Schultz conclude that "[a]t most, these cases address the general principles of bystander liability," and they fault the district court for failure to analyze "clearly established law requiring intervention in the specific context at issue."

Thomas responds that Bruss and Schultz's argument that he must point to authority "specific to canine force" is "untethered from the law as well as the underlying, notice-rooted purpose of [QI]." He adds, "this Court has recognized—across a wide array of factual circumstances and types of force—that 'an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.'" *See Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015). Thomas concludes, "In sum, the weight of this Court's precedent made clear to [Bruss and Schultz] that they were obligated to intervene to help and protect [] Thomas."

In its memorandum order and opinion denying summary judgment, the district court stated that "the relevant principles were clearly established before the alleged misconduct" and that "[b]ystander officers are liable if they 'knew [their] fellow officer was violating an individual's constitutional rights.'" *See Joseph*, 981 F.3d at 343. From there, the district court said this circuit "frames this test as having four elements" for when an officer is liable for failure to intervene: Liability attaches when the officer "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to

prevent the harm but nevertheless, (4) chose not to act." *See id.*

The district court then delved into an analysis of whether Bruss and Schultz met the elements for bystander liability. It determined first that "the record is clear that Johnson used constitutionally excessive force on Thomas"; second, that there were genuine and material factual disputes as to whether Bruss and Schultz knew that Johnson was violating Thomas's constitutional right to be free of excessive force; and third, that there were genuine and material factual disputes as to whether "Bruss and Schultz had a reasonable opportunity to intervene to stop the dog bite after Thomas was subdued." The district court therefore found that there were factual grounds to deny QI on the first prong.

The district court next analyzed the "clearly established law" prong of QI by following *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995). The court saw *Hale* as clearly establishing the law for each factual element of bystander liability as would be relevant to this case. In this the district court erred—we discuss *Hale* in greater detail *infra*—so we reverse.[8]

2.

First, we set out the elements of bystander liability. We then relate the facts of this case to those elements and discuss whether the law was clearly established.

A bystander officer may be held liable for constitutional violations where he "(1) knows that a fellow officer is violating an individual's constitu-

---

[8] Throughout the following analysis we assume, without deciding, that there might have been an underlying bystander violation; we therefore pass directly to the 'clearly established' analysis. We "have discretion to skip the first inquiry and resolve a case solely on clearly established grounds." *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018) (per curiam) (citing *Pearson*, 555 U.S. at 240).

tional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[9] Our precedents elaborate these elements.

In *Hale*, we held that there was a genuine issue of material fact where one police officer defendant had allegedly stood by, laughed, and shouted encouragement during another officer's assault of the plaintiff. 45 F.3d at 919. In *Whitley*, we held that one officer who was not present during another officer's sexual abuse of a minor was "not within the scope of a bystander liability claim." 726 F.3d at 647. This court added that even if knowledge of the risk was a touchstone, that officer would still not be liable because he deferred to another officer leading the investigation. *Id.* ("[The bystander] still would not be liable because he acted reasonably in entrusting [the principal] with investigating and arresting [the suspect.]"). Regarding that second officer's acting as principal investigator, this court held that, while witnessing a sexual assault during the course of his investigation and gathering evidence, that officer did not acquiesce in the offending officer's misconduct. *Id.*

To distill: (i) Knowledge, (ii) timing, and (iii) overt acquiescence may shape the scope of agency in principal-bystander relationships.[10] Conversely, where an officer (i) lacks knowledge, (ii) faces a rapidly evolving situation, and (iii) does not overtly acquiesce in the conduct of another—as by laughing

---

[9] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)). We have also broken down the bystander fact-elements into four: "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph*, 981 F.3d at 343.

[10] *See Randall*, 302 F.3d at 204 n.24 ("The rationale underlying the bystander liability theory is that a bystanding officer, by *choosing not to intervene*, functionally participates in the unconstitutional act of his fellow officer." (Emphasis added.)

or shouting encouragement—he does not make any choice, nor does he join the actions of the principal. *See Hale*, 45 F.3d at 919.

Even so, factually bridging the gap between the bystander and principal is insufficient, given that a plaintiff "must [still] identify clearly established law requiring an officer to intervene under similar circumstances." *Norman*, 151 F.4th at 714 (citation modified). This means that the elements of bystander liability pertain only to whether "the [bystander] official violated a statutory or constitutional right," *al-Kidd*, 563 U.S. at 735, such that the law must still be clearly established with respect to that violation.

For instance, in *Joseph*, 981 F.3d at 345, this court held that even where the plaintiff made out genuine disputes of material fact regarding several bystander officers who failed to intervene while two principals beat an arrestee, the plaintiff "[did] not defeat [QI]" because QI also turns on the clearly-established prong. We held that where the plaintiff failed to identify "a single case to support the argument that any reasonable officer would have known to intervene under these circumstances," QI still applied. *Id.*

In sum, a successful QI argument against a bystander officer must show (1) genuine disputes of fact as to (a) the principal's violation and (b) the bystander elements, and then (2) meet the second *al-Kidd* prong. As above, we assume that the first prong for the factual elements of bystander liability is made out, so we address only the second.

3.

Thomas and the district court failed to meet the rigorously high bar of QI's "clearly established" prong, failing to put the question "beyond debate," *Kisela*, 584 U.S. at 104 (citation modified), or to show that "preexisting law . . . truly compel[s]" rather than merely "rais[es] a question

about"[11] what a reasonable government actor would have done under the material circumstances of this case.

To review, several material facts of this case include the following:

- That the bite took 43 seconds, during which Johnson was handcuffing Thomas and immediately after which Johnson removed the dog;
- That each bystander arrived to the scene after many of Thomas's death wishes—with Schultz's characterizing the event as "his [Johnson's] scene";
- That Bruss told Thomas the dog bite would be taken off once he was handcuffed and soon told Johnson to remove the dog just after the bite had finished; and
- That Schultz was not a trained canine handler, and neither officer was alleged to have encountered this dog before—as background, Harris County's policy authorizes an officer to use force proportionate to a suspect's resistance analyzed under the totality of the circumstances, and classifies police dogs as a less-than-lethal form of force.

We canvass the rather sad precedents, some mentioned *supra*, to make the legal point that no clearly established law governs these facts:

(1) *Carroll* addressed the fact pattern of at least four police officers' beating a schizophrenic man lying on the ground and tasering him as many as thirty-five times; it does not control the bystander liability of two passive witnesses. 800 F.3d at 164–66.[12]

---

[11] *Pierce*, 117 F.3d at 882.

[12] *Deshotels v. Marshall*, 454 F. App'x 262 (5th Cir. 2011) (per curiam), is materially the same as *Carroll*. The district court also discussed *Timpa*, 20 F.4th 1020, released later in 2021 after February, but this is forbidden under the clearly-established analysis. *See Harper v. Harris Cnty.*, 21 F.3d 597, 601 (5th Cir. 1994) (per curiam) (explaining that whether the right is clearly established is determined at the time of the event—here, that is February

(2) *Trammel* addressed four officers' tackling a nonresistant suspect, breaking his spine and putting him into a wheelchair. 868 F.3d at 337–38. While it does stand for the proposition that an individual's passive resistance does not justify excessive use of force, *id.* at 341, that is not the question we address—and it has no bystander legal content, finding the plaintiff's arguments on failure-to-intervene waived, *id.* at 343.

(3) *Deville v. Marcantel* addressed a 45-year-old registered nurse's being pulled over for speeding, forcibly removed from her car, and shoved against the side of her vehicle. 567 F.3d 156, 161–62 (5th Cir. 2009). Its only relevance is again to the passive-active resistance versus proportionate force dimension, which is out-of-scope here.

(4) *Hamilton v. Kindred* addressed a bystander officer's watching a highly invasive and prolonged body cavity search of two women whose car had smelled of marihuana. 845 F.3d 659, 660–61 (5th Cir. 2017). It has little

---

2021).

Later-released cases cannot retroactively define the duties of officers. Moreover, *Timpa* is not even persuasive as a bystander liability case: One officer pressed his knee into the back of a suspect in a state of excited delirium and held the suspect there for fourteen minutes. *Id.* at 1026–27. After about eleven minutes in the bodyweight restraint against the ground, the suspect fell limp and unconscious, later dying. *Id.* Two bystander officers watched that process and made jokes during the restraint, including with regard to Timpa's falling unconscious. *Id.* This court denied QI for them, and for another officer who briefly left and returned to the scene, but granted QI with respect to a fourth officer who left the scene after the restraint had commenced but before Timpa fell unconscious and thereby lacked knowledge. *Id.* at 1039.

The same problem applies to *Austin v. City of Pasadena*, 74 F.4th 312 (5th Cir. 2023), which was decided well after February 2021. Its facts are also remote: Several officers entered the jail cell of an overdosing suspect undergoing an epileptic seizure. *Id.* at 319. The court denied QI for a bystander officer who actively held down the suspect while three other officers repeatedly tased the suspect, leading to his death. *Id.* at 320, 331. Finally, where Thomas briefs *Ambler v. Nissen*, 116 F.4th 351 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2683 (2026), that case is beyond the pale.

bearing on a rapid canine restraint at night with late-arriving officers who had not been party to the event and had heard from dispatch that there was at least one gun on the scene. To the extent we offered any analysis, *Hamilton* is a timing and opportunity precedent. *Id.* at 663.

(5) *Joseph* addressed a whole melee against a fleeing, mentally-ill suspect: One officer held him down with 300 pounds of bodyweight, another held down his legs, a third supplied those with a baton which they used to beat the suspect, a fourth kicked the suspect a dozen times, a handful more dragged the suspect across the floor, and still more shoved him roughly into a police vehicle. 981 F.3d at 326–28. As many as a dozen officers stood around observing the prolonged beating and encouraging it. *Id.* at 343. But this appalling melee is followed by a twist: The court in *Joseph* still granted QI for the bystanders where the plaintiff failed to produce cases before the district court showing that clearly established law required bystander officers affirmatively to intervene under analogous facts. *Id.* at 345–46. *Joseph* is remote.

(6) *Hale* is only a little closer: It featured three officers' raiding a Super Bowl party, with one of them beating the suspect directly, ramming him against a car, and repeatedly trying to slam the suspect's head against the car while two officers stood by laughing. 45 F.3d at 917. The suspect was affirmatively complying, there was no weapon alleged to be present, the officers were on the scene for the entire event, they actively *lured* him outside for the beating, and they affirmatively encouraged that beating. *Id.* at 918–19. Each point undermines the guidance "every reasonable office[er]" would have felt on the facts of this case. *See al-Kidd*, 563 U.S. at 741 (citation modified).

(7) *Cooper* is, at long last, a canine restraint case: We denied QI for a canine handling officer who released his dog to bite, for as long as two min-

utes, an unarmed and compliant suspect. 844 F.3d at 521. But importantly, *Cooper* did not discuss bystander liability or bystander duties whatsoever. As this court observed in *Sligh*, "*Cooper* is wholly inapplicable to a bystander liability theory." 87 F.4th at 301.[13]

In *Sligh*, we held that a canine handler used excessive force by releasing a canine for a 64-second bite onto a suspect who was not suspected of any crime, did not pose an immediate safety threat, and needed emergency medical intervention following self-harm. *Id.* at 296–97. But *Sligh* also involved a "bystander" officer—though that officer affirmatively participated in handcuffing the suspect. The Court granted the bystander officer QI because the plaintiff failed to identify any law clearly establishing a constitutional duty to intervene in those circumstances. *Id.* at 299–301. Indeed, *Sligh* expressly limited itself by stating that "we . . . need not and do not reach the question of whether [the bystander officer] violated Sligh's constitutional rights" and added that the plaintiff failed to identify "law clearly establishing that [the bystander officer]'s actions violated her constitutional rights, i.e., . . . that any reasonable officer would have known that the Constitution required them to intervene." *Id.* at 301 (citation modified).

In sum, *Cooper* addressed a constitutional violation for excessive force through a canine restraint for an officer who controlled the dog in the first instance, and as *Sligh* points out, it does nothing to establish bystander liability in that situation and cannot establish clearly controlling law here.

"The Supreme Court strictly enforces the requirement to identify an analogous case and explain the analogy." *Joseph*, 981 F.3d at 346.[14] More-

---

[13] *Sligh* was also decided in 2023, after these events in February 2021.

[14] *Accord D.C. v. Wesby*, 538 U.S. 48, 63 (2018) ("The 'clearly established' standard requires that the legal principle prohibit the officer's conduct in the particular circumstances before him . . . . This requires a high 'degree of specificity.'") (quoting *Mullenix*,

over, excessive force claims are so fact-specific that the "clearly established" prong must be defined at a reasonable level of specificity rather than a high level of generality: "[E]xcessive force claims often turn on split-second decisions to use . . . force. That means the law must be so clearly established that—in the blink of an eye . . .—every reasonable officer would know it immediately." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (citation modified).

None of the cases mustered by Thomas presents fact patterns making it "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d]" any right to bystander intervention. *Mullenix*, 557 U.S. at 11–12 (cleaned up). This was a dynamic situation with multiple suspects, an unknown firearm, an invitation to die, and a 43-second canine assisted arrest, where the officers only passively witnessed the unfolding events and never affirmatively acquiesced in the conduct.

Each point is a material distinction. And this court has never held that officers have a constitutional duty to intervene in *every* canine arrest. The lack of an analogous case matters because the situation that Bruss and Schultz encountered in February 2021 does not meet the "sky high" standard for establishing "the rare obvious case for which no similar case is needed." *Joseph*, 981 F.3d at 337.[15] Here, the lack of an analogous precedent in the canine-assisted apprehension context is not fatal to Thomas's argument that Bruss and Schultz should be denied QI. Rather, because of the total duration of the dog bite was 43 seconds[16]—a relatively short period of time for a by-

577 U.S. at 13).

[15] Thomas does not rely on a "robust consensus of cases of persuasive authority" holding that a right is clearly established. *al-Kidd*, 563 U.S. at 742 (cleaned up).

[16] Of course, a dog bite lasting 43 seconds is undoubtedly painful and prolonged from Thomas's perspective.

stander officer mentally to process the situation and then formulate a reaction—we cannot say that the law clearly required Bruss and Schultz to intervene sooner. That is particularly the case with Bruss, who inspected the parameter during part of the 43 seconds and took alleviative action by telling Johnson to remove the dog bite toward the end of the 43-second bite.

In sum, this is not close by QI standards, and even if it were close, QI reflects the jurisprudential restraint, originating in *Pierson v. Ray*, 386 U.S. 547 (1967), not to embark upon improvident campaigns of second-guessing by lawyers safely ensconced in their offices, chilling officers' actions in the field reasonably aimed at protecting the public for "fear [of] being sued." *Hunter*, 502 U.S. at 229.

* * * * *

The judgment is REVERSED, and a judgment of dismissal in favor of the defendants is RENDERED.